IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| TINA E. OMAN,<br><br>          Plaintiff,<br><br>     vs.<br><br>STATE OF HAWAI'I DEPARTMENT<br>OF EDUCATION,<br><br>          Defendant. | Civil No. 21-00462 MWJS-WRP<br><br>ORDER DENYING DEFENDANT'S<br>MOTION FOR SUMMARY<br>JUDGMENT |

**ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Tina Oman, a former counselor at a public middle school on Maui, alleges that she was sexually harassed by the school's principal. According to Oman, the State of Hawai'i Department of Education (DOE) took no action on her complaints for several months. And when the DOE finally got around to investigating her concerns, it did more than just that: it also tacked on investigations into Oman herself. Oman eventually resigned from her position and brought this action against her former employer for sexual harassment and retaliation in violation of Title VII, Title IX, and Hawai'i state law.

The DOE now moves for summary judgment, arguing, among other things, that Oman might not be able to prove some of her critical factual assertions at trial. That may well be. But Oman has proffered enough evidence at least to raise

genuine disputes as to material facts, and the DOE therefore is not entitled to judgment as a matter of law.  Its motion for summary judgment is DENIED.

## <u>BACKGROUND</u>

The events underlying this case began in 2017, when Matthew Dillon joined Iao Intermediate School—a public school operated by the DOE—as its new principal.  ECF No. 71-3, at PageID.292 (Dillon Decl. ¶ 3).  Tina Oman had worked as a counselor at Iao Intermediate for over a decade, seemingly without incident.  ECF No. 71, at PageID.280 (Def.'s Concise Statement of Facts (CSF) ¶ 1); ECF No. 80-2, at PageID.466 (Oman Dep. 33:3-33:5).  But when Dillon arrived, things "went downhill right away."  ECF No. 80-2, at PageID.466 (Oman Dep. 33:19).

According to Oman, the harassment began immediately and lasted for nearly three years.  *See id.* at PageID.466-67 (33:19-34:15).  Daily, Dillon "would watch" Oman walk from her car to her office.  *Id.* at PageID.467 (34:3).  He frequently stopped Oman around campus to "try to get [her] to talk to him about just random stuff," and he would "get all excited in his face."  *Id.* at PageID.471 (38:14-38:16).  On one occasion, he "made a comment" about "his four-year old daughter's panties."  *Id.* at PageID.467 (34:1-34:2).  On another, Dillon asked Oman to accompany him to a graduation ceremony.  *Id.* at PageID.471 (38:1-38:3).  These

interactions led Oman to believe that Dillon was "trying to have some type of personal relationship with [her]." *Id.* (38:19-39:20).

Most troublingly, Oman claims that Dillon masturbated in her presence on several separate occasions. Two times, Oman says, were in her office. *Id.* at PageID.481 (48:3-48:4). Dillon "came in, shut the door, and sat down blocking the door." *Id.* (48:14-48:15). He started off by talking about work, but then "he reached down, and he started moving his hands right along the side of his genitals." *Id.* (48:18-48:19). "[H]e just kept doing it. Like it was so slow motion and exaggerated. And he had that creepy look on his face, he was red." *Id.* (48:20-48:22). In that moment, her relationship "just shifted"—Dillon was "not [her] boss," and Oman was "not his employee." *Id.* (48:24-48:25).

Another encounter, Oman says, was in Dillon's office. Oman and a student were meeting with him. *Id.* at PageID.479 (46:8-46:9). When the student left, Oman stood up to leave too. *Id.* (46:12-46:13). But Dillon called her back, saying, "I need to talk to you about something, sit right here." *Id.* (46:13-46:15). He started "grilling" her about two emails she had sent to the vice principals. *Id.* (46:17-46:18). When he wrapped up his questioning, Oman again stood to leave. *Id.* (46:21). Dillon, however, said something (what exactly, Oman cannot recall) and Oman turned back around. *Id.* (46:21-46:24). Dillon "just reached down, and grabbed ahold of his genitals, and started moving them up and down." *Id.* at

PageID.479-80 (46:25-47:1). He was "red-faced, like excited." *Id.* at PageID.480 (47:2). In disbelief, Oman "just froze." *Id.* (47:5).

All told, Oman claims that Dillon masturbated in front of her four different times.[1] *Id.* at PageID.485 (52:13-52:16). Two were in Oman's office, with Dillon blocking the door. *Id.* at PageID.481 (48:3-48:6). The other two were in Dillon's office. *Id.*

The DOE does not dispute that Dillon touched his genital area in front of Oman. ECF No. 71, at PageID.281 (Def.'s CSF ¶ 5). But it claims that Oman's evidence will not prove that this was masturbation. The DOE asserts that Dillon was merely involuntarily adjusting his pants, a symptom of his then-undiagnosed obsessive-compulsive disorder. *See id.* (¶¶ 5, 6); ECF No. 79-2, at PageID.427 (Def.'s CSF ¶ 8). In the DOE's view, the involuntary adjustment was not sexual in nature. ECF No. 79-2, at PageID.427 (Def.'s CSF ¶ 8).

---

[1] Oman's deposition testimony is, to be sure, hardly a model of clarity: it could be read as identifying only two instances of masturbation, as Oman appears to suggest that the first time Dillon touched himself inappropriately was *not* masturbation. ECF No. 80-2, at PageID.483-84 (Oman Dep. 50:17-51:20). But elsewhere, after Oman described one masturbation incident, she was asked "how many times before that did this type of behavior happen?" *Id.* at PageID.481 (48:1-48:2). She answered that there were three other times—two in her office, and one in Dillon's old office. *See id.* (48:3-48:6). As the Court must view the evidence in favor of the non-moving party at the summary judgment stage, it reads the deposition testimony as alleging four separate instances of masturbation, leaving it for a jury to decide whether the assertion of four separate instances is credible.

In October 2019, shortly after the final alleged masturbatory incident, *see* ECF No. 80-2, at PageID.478-79 (Oman Dep. 45:24-46:2), Oman complained about Dillon's behavior to DOE administrators, including the Complex Area Superintendent Kathleen Dimino, the State Superintendent Christina Kishimoto, and Dillon himself, *id.* at PageID.491.[2]  According to Oman, she "let the DOE know that [she] was being sexually harassed."  *Id.* at PageID.467 (34:9-34:10).  The DOE admits that Oman filed a complaint of sexual harassment in October 2019.  ECF No. 71, at PageID.280 (Def.'s CSF ¶ 4).

It appears that nothing came of that initial complaint, however, and the DOE does not contend otherwise.  Instead, Oman alleges that Dillon kept "sending [her] emails trying to get [her] to meet with him alone."  ECF No. 80-2, at PageID.494 (Oman Dep. 61:7-61:8).  Oman "didn't know what to do about it."  *Id.* (61:11).

So in January 2020, Oman again raised her concerns with Dimino and Kishimoto in an email, copying Dillon.  *Id.* (61:13-61:14); *id.* at PageID.496 (63:23-63:24).  She said that Dillon had been "doing some things that were upsetting."  *Id.* at PageID.494 (61:15-61:16).  In turn, Dillon forwarded that email to the DOE's investigation team.  ECF No. 79-2, at PageID.427 (Def.'s CSF ¶ 5).

---

[2]     At the hearing, the parties recalled that the October 2019 complaint was made to Lesley Castellanos.  In her deposition testimony, however, Oman alleges that it was made to six other administrators—Castellanos was not one of them.

Around the same time, Oman also complained to Lesley Castellanos, an equity specialist at the DOE.  ECF No. 80-2, at PageID.491 (Oman Dep. 58:7-58:8).

Castellanos contacted Oman, asking to talk.  *See* ECF No. 79-2, at PageID.427 (Def.'s CSF ¶¶ 5-6).  In an interview, Oman again shared that she had been sexually harassed.  *See id.* (¶ 6).  Oman formally signed a complaint of sexual harassment against Dillon the following month, in February 2020.  ECF No. 77-2, at PageID.387 (Pl.'s CSF ¶ 12); ECF No. 80-2, at PageID.499 (Oman Dep. 66:17-66:18).

Just as the investigation into Dillon was getting underway, Oman learned that *she* had just been placed under investigation.  ECF No. 77-1, at PageID.383 (Pl.'s CSF ¶ 14); ECF No. 71-8, at PageID.330 (Notice of Compl. & Investigation).  Two coworkers—subordinates of Dillon—had complained about Oman, alleging that she harassed, intimidated, demeaned, and bullied her colleagues.  ECF No. 71-9, at PageID.332.  A few months later, a third counselor filed a complaint against Oman with similar allegations.  ECF No. 71, at PageID.282 (Def.'s CSF ¶ 18).  Both complaints triggered investigations.  ECF No. 77-1, at PageID.383 (Pl.'s CSF ¶¶ 17, 19); ECF No. 71-2, at PageID.287 (Dimino Decl. ¶¶ 4-6).

All the while, the DOE was investigating Oman's allegations against Dillon. That investigation concluded in September 2020, and it found that Dillon had

"grabbed his genitals in his pants and shook them in the presence of Counselor

Oman." ECF No. 77-4, at PageID.392 (Final Investigation Rep.). In front of

another staff member, Dillon had "slid his hand over his penis in his pants." *Id.*

Kathleen Dimino, the Complex Area Superintendent, concurred with those

findings. ECF No. 78, at PageID.413-15. Dillon was diagnosed with obsessive-

compulsive disorder, and he sought treatment for what he calls an "unconscious

nervous tick." ECF No. 71-3, at PageID.292 (Dillon Decl. ¶ 5).

The two investigations into Oman's conduct concluded the following year,

in mid-2021. They largely substantiated the allegations, finding that Oman had

created a hostile work environment for other employees at Iao Intermediate. *See*

ECF No. 77-1, at PageID.383 (Pl.'s CSF ¶¶ 19, 20); ECF No. 71-9, at PageID.332-

34 (executive summary of January/February 2020 complaints); ECF No. 71-14, at

PageID.357-58 (investigation report of April 2020 complaint). Both investigations

concluded that corrective action was warranted. ECF No. 77-9, at PageID.334;

ECF No. 71-14, at PageID.358. But before any action could be taken, Oman

resigned in October 2021. ECF No. 77-1, at PageID.384 (Pl.'s CSF ¶ 24).

The following month, Oman initiated this action. She presses claims for

sexual harassment and retaliation, which she brings under Title VII, Title IX, and

§ 378-2 of the Hawaiʻi Revised Statutes (HRS). ECF No. 1, at PageID.9-13

(Compl. ¶¶ 52-77).

A hearing was held on June 12, 2024.  ECF No. 83.  To supplement deficiencies in the record, the Court directed Oman's counsel to file her complete deposition transcript.  *See* Fed. R. Civ. P. 56(e).  Oman complied that day.  ECF No. 80-2.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when a moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To prevail, the movant must demonstrate the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When the moving party will not have the burden of proof at trial—like the DOE in this case—it must do more than simply "deny[] the allegations in the opponent's pleadings" or "assert[] that the nonmovant lacks evidence to support its claim."  10A Charles A. Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2727.1 (4th ed. 2016).  Instead, the movant must "produce evidence negating an essential element of the nonmoving party's claim" or "show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden" at trial.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the movant makes that showing, the burden shifts to the opposing party, who must "produce enough evidence to create a genuine issue of material fact." *Id.* at 1103.  This burden "is not a heavy one," as "the nonmoving party simply is required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial." *Dark v. Curry County*, 451 F.3d 1078, 1082 n.2 (9th Cir. 2006) (internal quotation marks omitted).

A court may not grant summary judgment if the evidence could be subject to conflicting interpretations, which could lead to different understandings of a material fact.  *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).  Questions of credibility, moreover, must be reserved for the jury.  *Id.* at 630.  And the Court must construe all facts and draw all reasonable inferences in favor of the nonmoving party.  *Id.* at 631.

## DISCUSSION

Oman argues that she was subjected to unlawful sexual harassment and retaliation, in violation of Title VII, Title IX, and HRS § 378-2.  And, opposing the DOE's motion for summary judgment, she argues that she should have the chance to present her case to a jury.  The Court agrees.

### A.    Sexual Harassment

Although Title VII, Title IX, and HRS § 378-2 all forbid employment discrimination on the basis of sex in educational institutions, they have slightly

9

different standards for establishing liability.  The question, at this summary judgment stage, is whether Oman has presented sufficient evidence at least to raise a genuine dispute as to the material facts needed to prove the elements of these claims.

1.  Begin with Title VII, which prohibits sexual harassment that creates a hostile work environment.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).  To establish a prima facie case of a hostile work environment, a plaintiff must show that "(1) she was subjected to verbal or physical conduct of a sexual nature, (2) this conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007) (quoting *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995)).

Although the DOE implicitly concedes that Dillon's conduct was unwelcome, it argues that the conduct was not sexual in nature.  According to the DOE, Dillon was merely making an "adjustment" by "tugging at the thigh area of his pants, without touching the groin area."  ECF No. 71-5, at PageID.313-14.  But Oman alleges otherwise, describing in some detail how Dillon touched and moved his genitals.  She backs up these allegations with her deposition testimony, which directly contradicts the DOE's assertion that Dillon never touched his groin area.

10

Accordingly, Oman has identified a dispute of material fact.  And while a jury may well find that Oman's testimony lacks credibility, as the DOE suggests, the Court may not resolve questions of credibility at the summary judgment stage.  *T.W. Elec. Serv.*, 809 F.2d at 630.[3]

The DOE separately contends that the alleged conduct was insufficiently severe or pervasive, such that it did not alter Oman's working environment.  In assessing whether an environment is hostile, a court must consider "all the circumstances," including the conduct's frequency, severity, and nature.  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001).  Importantly, "[t]he required severity for harassing conduct varies inversely with the pervasiveness or frequency of the conduct."  *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 649 (9th Cir. 2021) (internal quotation marks omitted).  And the workplace must be both subjectively and objectively hostile; that is, it must be hostile not only in the eyes of the plaintiff, but also in the eyes of a reasonable person with the same characteristics as the plaintiff.  *Craig*, 496 F.3d at 1055; *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1034 (9th Cir. 2005) (noting that, when the plaintiff

---

[3]      Indeed, at the hearing, the DOE admitted that whether these incidents are best described as masturbation or as adjustments rests on a credibility determination—Dillon's word against Oman's—which is a question for the factfinder.

is female, "[w]e assess whether the workplace was objectively hostile from the perspective of a reasonable woman").

As an initial matter, the evidence suggests that Oman subjectively perceived her work environment as hostile.  In her deposition, Oman stated that she "was living in constant fear" because of Dillon's conduct.  ECF No. 80-2, at PageID.500 (Oman Dep. 67:7-67:8).  She "tried to get to [her] office without him seeing [her]," and once there, she would hide and not "talk to anybody."  *Id.* (67:16-67:18).  She claims that "[i]t was hard to do [her] job, because [she] didn't want to go out of [her] office."  *Id.* (67:18-67:19).  She was "not sleeping, just panic[king], on edge, hypervigilant, dread[ing] going to work."  *Id.* at PageID.501 (68:1-68:2).  For Oman, these encounters "shifted" her relationship with her boss and, consequently, her work.  *Id.* at PageID.481 (48:24).

Whether the environment was objectively hostile is a closer call.  Some scenarios are so patently offensive that they are clearly severe or pervasive.  Consider *Little v. Windermere Relocation, Inc.*, in which the Ninth Circuit found a work environment "irrevocably alter[ed]" when an employee was raped three times in a single night by a business associate and had her pay cut after reporting it.  301 F.3d 958, 967-68 (9th Cir. 2002).  Or take *Meritor Savings Bank*, in which the Supreme Court held that allegations of demands for sexual intercourse, unwelcome

touching, and forcible rape, 477 U.S. at 60, were "plainly sufficient to state a claim for 'hostile environment' sexual harassment," *id.* at 67.

These cases, however, are the extreme.  Lesser conduct can also be actionable.  For example, a series of "[w]ell-intentioned compliments" from coworkers—including a three-page "love letter" confessing to having "enjoyed you so much over these past few months"—can give rise to Title VII liability.  *Ellison v. Brady*, 924 F.2d 872, 874, 880 (9th Cir. 1991).  So too can the persistent playing of misogynistic and sexually graphic music in a workplace.  *Sharp v. S&S Activewear LLC*, 69 F.4th 974, 979-81 (9th Cir. 2023).

Of course, some allegations fall short of the severe or pervasive requirement.  No claim for a hostile work environment could proceed where the plaintiff complained of an offensive word in a memorandum, a reference to "hoochi mammas" over a school loudspeaker, and a comment that students needed to "cover up their business."  *Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1019-20 (9th Cir. 2018).  And a few crude jokes, ridicule for mispronouncing a word, and a gesture that "mock[ed] the appearance of Asians" were not sufficiently hostile so as to alter the plaintiff's employment conditions.  *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798-99 (9th Cir. 2003).

The Court must assess where Oman's allegations reside along this spectrum of conduct.  As alleged by Oman, Dillon's conduct "falls somewhere between

13

mere isolated incidents or offhand comments, which do not amount to a Title VII claim, and serious and pervasive harassment, that clearly comes within Title VII." *Craig*, 496 F.3d at 1056 (citations omitted).

Many of Oman's allegations—that Dillon was watching her, that he tried to converse with her, and that he asked to meet with her—are not sufficiently severe or pervasive to give rise to a Title VII claim. A reasonable woman would understand that a principal of a school has a duty to meet with staff, to know their general whereabouts, and to be visible on campus. *See* ECF No. 71-3, at PageID.293 (Dillon Decl. ¶ 9). These allegations, standing alone, do not demonstrate severe or pervasive conduct that could alter the conditions of Oman's employment.

Oman's assertion that Dillon brought up "his four-year old daughter's panties out of the blue," ECF No. 80-2, at PageID.467 (Oman Dep. 34:1-34:2), is certainly troubling. But Oman does not provide more context for this remark, and a bizarre, stray comment does not alone demonstrate workplace hostility.

The conduct that Oman focuses on—and that is the real heart of the dispute—is the alleged masturbation. She claims that there were four separate incidents, and Oman describes two of them in detail. In her deposition, Oman recounted how Dillon entered her office, "block[ed] the door," and "started moving

14

his hands right along the side of his genitals." *Id.* at PageID.482 (48:14-48:19). Dillon "just kept doing it" in "slow motion." *Id.* (48:20-48:21).

Another time, Oman was visiting Dillon's office with a student. She remembers trying to leave his office, but Dillon "called [her] back in," saying that he needed to "talk to [her] about something." *Id.* at PageID.479 (46:13-46:15). He "just reached down, and grabbed ahold of his genitals, and started moving them up and down." *Id.* at PageID.479-80 (46:25-47:1). Oman "froze," in disbelief that "it was happening." *Id.* at PageID.480 (47:7).

In light of these allegations, the Court concludes that a reasonable observer could find a supervisor's repeated masturbation creates a hostile work environment. The alleged conduct does appear to be infrequent; because Oman has not alleged when these encounters began, it is possible that these four incidents were spread out over two-and-a-half years, from Dillon's arrival in January 2017 until the final incident in the fall of 2019. But a reasonable observer could conclude that the conduct was severe. Masturbating in front of a colleague in the workplace is wildly inappropriate. According to Oman, on two of the occasions, Dillon stepped into her office, closed the door, and blocked her exit. A reasonable woman in Oman's position could feel that this conduct was intimidating, threatening, and humiliating—some sort of crude advance intended to pressure her into sexual favors.

15

And recall that Dillon was not just a coworker; he was the principal of the school and Oman's supervisor.  That power dynamic exacerbates the potential harm, making Dillon's "actions emotionally and psychologically threatening." *Craig*, 496 F.3d at 1056.  A reasonable woman could determine that Dillon's behavior irrevocably distorted the professional relationship between Dillon and Oman.  *See Brooks v. City of San Mateo*, 229 F.3d 917, 927 & n.9 (9th Cir. 2000) (recognizing that, compared to a coworker's conduct, a supervisor's actions are more likely to alter the terms of employment and create a hostile work environment "[b]ecause the employer cloaks the supervisor with authority").

It is true, as the DOE points out, that Dillon did not undress himself.  Although outright nudity would make this a clearer case, Oman specifically alleges that Dillon grabbed and stroked his genitals over his pants.  A natural inference, if Oman's testimony is credited, is that Dillon was engaging in sexual self-gratification in front of a subordinate.  A reasonable woman could find that conduct to be so inappropriate that it alters the conditions of employment.  Oman has therefore established a genuine dispute of fact as to whether her workplace was objectively hostile.

Although employers may raise an affirmative defense to liability under Title VII, the DOE has not successfully done so at this summary judgment stage.  Generally, an employer is vicariously liable when a supervisor's conduct creates a

hostile environment for an employee.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).  The employer may, however, assert an affirmative defense if (1) "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities."  *Id.*  Here, the DOE does not satisfy the first prong of this test, as the evidence at this summary judgment stage indicates that the DOE took no action on Oman's first complaint at all.  That cannot be said to be a "prompt[]" correction of Dillon's behavior.

For these reasons, viewing the facts and drawing all reasonable inferences in the non-movant's favor, Oman has tendered sufficient evidence to preclude summary judgement on her hostile work environment claim under Title VII.

2.   Oman also advances a sexual harassment claim under Title IX, on which the DOE also seeks summary judgment.  Title IX prohibits sex discrimination in educational programs that receive federal funding.  *See* 20 U.S.C. § 1681(a).  Although usually applied to students, the statute's broad language—"No *person* in the United States shall, on the basis of sex, be . . . subjected to discrimination . . . ." *id.* (emphasis added)—has been read to include employees of educational institutions.  *See N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 522, 530 (1982).  The result is that both Title VII and Title IX may apply where, as here, the

employment discrimination claims arise in a school that receives federal funding.
*See, e.g.*, *Campbell*, 892 F.3d at 1023-24.[4]

Most employment discrimination claims brought under both Title VII and Title IX are evaluated "identically."  *Id.* at 1023; *see also Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643, 651 (1999) (citing to Title VII case to define harassment under Title IX, even while declining to extend Title VII liability standards to Title IX).  Here, Oman's factual allegations underlying her Title VII and Title IX claims are identical.  Accordingly, for the same reasons that Oman has established a hostile work environment under Title VII, so too has she established one for purposes of Title IX.[5]

---

[4]     Some courts have held that Title VII displaces Title IX for employment discrimination claims.  *See Fox v. Pittsburg State Univ.*, 257 F. Supp. 3d 1112, 1119-24 (D. Kan. 2017) (surveying the circuit split).  *See generally* Kendyl L. Green, *Title VII, Title IX, or Both?*, 14 Seton Hall Cir. Rev. 1 (2017).  Rather than categorically arguing that Title IX cannot apply here, the DOE has taken Oman's arguments head on.  The Court therefore assumes, for purposes of this motion, that Oman may bring her claims under both Title VII and Title IX.

[5]     The DOE cites *Karasek v. Regents of the University of California*, 956 F.3d 1093 (9th Cir. 2020), for the sexual harassment standard under Title IX.  *Karasek* required the plaintiffs to have suffered harassment "that is so severe, pervasive, and objectively offensive that it can be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school."  *Id.* at 1105 (alteration omitted) (quoting *Davis*, 526 U.S. at 650).  *Karasek*, however, cabined its analysis to claims "aris[ing] from student-on-student or faculty-on-student sexual harassment"—it did not extend to employee-on-employee harassment, *id.*, for which a standard Title VII analysis might be more appropriate.  Indeed, the Supreme Court has cautioned that "schools are unlike the adult workplace"

But whether the DOE may be subject to damages liability is a separate question, one for which the standards under Title IX and Title VII differ.  It is easier to obtain a damages remedy under Title VII, and this flows in part from the fact that Congress has "carefully limited the amount recoverable in any individual case" under Title VII, "calibrating the maximum recovery to the size of the employer."  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998).  By contrast, "the private right of action under Title IX is judicially implied," and there is, accordingly, no statutory cap on the amount of available damages.  *Id.* at 284.  Responding to this difference, the Supreme Court has narrowed the range of cases in which Title IX's "unlimited recovery in damages" can be obtained.  *Id.* at 285.  Under Title IX, even after a plaintiff has established that she endured sexual harassment in a hostile workplace, damages liability will only attach if the plaintiff also shows that the school responded with "deliberate indifference"; that is, a school official with "authority to address the alleged discrimination" must have had "actual knowledge of discrimination" and "fail[ed] adequately to respond."  *Id.*

---

because "children may regularly interact in a manner that would be unacceptable among adults."  *Davis*, 526 U.S. at 651.  In any case, even under the *Karasek* standard—and crediting Oman's testimony and drawing all reasonable inferences in her favor, as the Court must do at this stage—a reasonable woman could find that Dillon's conduct was sufficiently severe, pervasive, and offensive to deprive Oman of the benefits of her employment.

at 290.  In other words, the school's response must be "clearly unreasonable."

*Davis*, 526 U.S. at 649.

Here, the October 2019 complaint spells the end of the DOE's argument.
The DOE admits, at least for summary judgment purposes, that "[o]n or about
October 23, 2019, [Oman] complained of sexual harassment regarding Principal
Matthew Dillon."  ECF No. 71, at PageID.280 (Def.'s CSF ¶ 4).  And Oman
alleges that she made her October 2019 complaint to all levels of DOE leadership,
including Principal Dillon, Complex Area Superintendent Dimino, and State
Superintendent Kishimoto.  ECF No. 80-2, at PageID.491 (Oman Dep. 58:1-58:4).
Yet the DOE does not contend that it took *any* steps in response to that complaint,
nor does the DOE offer any explanation for its inaction.

Presented with this evidence, a reasonable factfinder could conclude that
senior officials throughout the DOE—officials with the "authority to address the
alleged discrimination"—knew about Oman's allegations yet failed to take any
corrective steps.  Granted, it is possible that DOE officials had some justification
for their apparent inaction—perhaps they were internally discussing how to handle
the situation, or maybe the specific allegations in the October 2019 complaint were
not sufficiently alarming to prompt investigation.  But on its summary judgment
motion, the DOE has offered no such evidence.

20

This inaction is more concerning when considered against the backdrop of the DOE's general policy. The DOE contends that it is a "standard procedure[]" to investigate complaints. ECF No. 71, at PageID.282 (Def.'s CSF ¶ 17). In her declaration, Complex Area Superintendent Dimino said that she has "no discretion whether to conduct the investigations or not," because "[a]ll complaints and allegations of harassment are taken seriously." ECF No. 71-2, at PageID.287 (Dimino Decl. ¶ 5). The DOE does not explain, however, why complaints *against* Oman triggered prompt investigations while the first complaint *by* Oman did not.

The DOE raises one final argument. It says that deliberate indifference alone is not enough to establish liability under Title IX—the DOE's deliberate indifference must have *also* subjected Oman to *additional* harassment. ECF No. 71-5, at PageID.312 (citing *Karasek*, 956 F.3d at 1105); *id.* at PageID.314. And because Oman concedes that Dillon did not again masturbate in her presence after she filed her first complaint, *see* ECF No. 80-2, at PageID.483 (Oman Dep. 50:1-50:24), the DOE says it cannot be liable for damages.

Assuming the additional harassment standard applies here,[6] the Court concludes that a reasonable factfinder could determine that it has been met. First,

---

[6]     This requirement originates in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, in which the Supreme Court held that student-on-student harassment could give rise to damages liability under Title IX. 526 U.S. at 633. It recognized that requiring a school's deliberate indifference to itself "subject[]"

*Karasek* requires that the school either "caused the plaintiff to undergo harassment" *or* "made the plaintiff liable or vulnerable to it."  956 F.3d at 1105 (cleaned up).  Even though Dillon may not have masturbated in front of Oman again, that does not mean the hostile work environment had abated.  According to her deposition, after Oman filed her first complaint, Dillon tried to meet with her alone.  And after Oman's second complaint, when an investigation was finally opened into Dillon, he immediately emailed Oman, directing her to meet with him or be charged with "insubordination."  ECF No. 80-2, at PageID.497 (Oman Dep. 64:23).  Through it all, Oman says that she remained fearful in her workplace.  A reasonable juror could therefore conclude that the DOE's failure to respond to Oman's first complaint made her "vulnerable" to further harassment, even if the worst of it did not occur again.  Construing facts and drawing reasonable inferences in Oman's favor, that is sufficient to survive the motion for summary judgment as to Oman's Title IX claim for sexual harassment.

3.   Oman also brings a claim under HRS § 378-2.  Like its federal counterparts, HRS § 378-2 prohibits sexual harassment that gives rise to a hostile workplace.  *Nelson v. Univ. of Haw.*, 97 Hawaiʻi 376, 387, 38 P.3d 95, 106 (2001).

---

students to harassment" would have the effect of "limit[ing] a [school]'s damages liability to circumstances wherein the [school] exercises substantial control over both the harasser and the context in which the known harassment occurs."  *Id.* at 644-45.  This case appears to present those circumstances, for Iao Intermediate exercises control over the harasser (the principal) and the context (the campus).

Oman and the DOE raise the same arguments under Hawaiʻi law as they do under Title VII and Title IX.  And the Hawaiʻi Supreme Court has observed that, when interpreting HRS § 378-2, "federal courts' interpretations of Title VII of the Civil Rights Act of 1964 are persuasive, but not controlling."  *Arquero v. Hilton Hawaiian Vill. LLC*, 104 Hawaiʻi 423, 429-30, 91 P.3d 505, 511-12 (2004) (citation omitted).

A hostile work environment claim under Hawaiʻi law thus resembles claims brought under Title VII and Title IX.  *See Maluo v. Nakano*, 125 F. Supp. 2d 1224, 1231 (D. Haw. 2000) (observing that Hawaiʻi state law and Title VII have "similar elements for a hostile work environment claim for sexual harassment").  In cases like the one at hand, a plaintiff must establish six elements:  (1) a plaintiff was "subjected to sexual advances, requests for sexual favors, or [sexual] verbal or physical conduct"; (2) "the conduct was unwelcome"; (3) "the conduct was severe or pervasive"; (4) the conduct's purpose or effect was to "creat[e] an intimidating, hostile, or offensive work environment"; (5) the plaintiff "actually perceived the conduct as having such purpose or effect"; and (6) the plaintiff's "perception was objectively reasonable."  *Id.* at 428, 91 P.3d at 510 (emphases omitted).

There is, however, one salient distinction.  While federal courts tend to analyze conduct's severity and pervasiveness through the lens of whether it affected the plaintiff's work environment—hence the inquiry into whether "the

conduct was sufficiently severe or pervasive *to alter the* conditions of the [plaintiff]'s employment," *Craig*, 496 F.3d at 1055 (emphasis added) (quoting *Fuller*, 47 F.3d at 1527)—Hawaiʻi courts treat these as "separate and distinct" questions. *Arquero*, 104 Hawaiʻi at 431, 91 P.3d at 513. Put differently, Hawaiʻi law requires a separation of "the severity and pervasiveness of the conduct from the effect that conduct had on the employee's work environment." *Id.*

Despite these distinctions, the Court concludes that Oman has offered enough evidence, at this stage, to allow a reasonable factfinder to conclude that the state-law test, like the tests under Title VII and Title IX, is satisfied here. For the reasons outlined above, the evidence construed in Oman's favor establishes that she was subjected to Dillon's unwelcome sexual conduct, his masturbation was severe, the effect was to create an intimidating and hostile environment, Oman perceived it as such, and a reasonable woman in Oman's shoes would do so too. Accordingly, the Court DENIES the DOE's motion for summary judgment as to Oman's sexual harassment claims.

### B.   Retaliation

Oman also brings claims for retaliation. Federal and Hawaiʻi law forbid retaliating against employees for engaging in protected activities. The same burden-shifting framework applies to retaliation claims pressed under Title VII, Title IX, and HRS § 378-2(2). *Emeldi v. Univ. of Or.*, 673 F.3d 1218, 1223 (9th

Cir. 2012) (applying the same standard under Title VII and Title IX), *as amended*, 698 F.3d 715 (9th Cir. 2012); *Schefke v. Reliable Collection Agency, Ltd.*, 96 Hawaiʻi 408, 426, 32 P.3d 52, 70 (2001) (adopting the Title VII framework for HRS § 378-2(2) retaliation claims).

Under this burden-shifting framework, a plaintiff first must show that (1) she "engaged in protected activity," (2) "she suffered an adverse action," and (3) "there was a causal link between the two." *Emeldi*, 673 F.3d at 1223. If a plaintiff makes that prima facie showing, the defendant must articulate a legitimate, non-discriminatory reason for its actions. *Id.* at 1224. If the defendant articulates such a reason, the final burden returns to the plaintiff, who must show that the defendant's proffered reason is pretext for discrimination. *Id.*

The Court therefore begins by evaluating whether Oman has established a prima facie case. The DOE does not dispute that Oman's filing of the complaints against Dillon was a protected activity. Nor does the DOE dispute that initiating an investigation into Oman could be considered an adverse employment action.[7]

---

[7]    Because the DOE does not challenge the second prong of analysis—that Oman experienced an adverse employment action—the Court assumes for the sake of this motion that the investigation opened into Oman's conduct constituted an adverse employment action. *See Campbell*, 892 F.3d at 1022 ("We have previously indicated that merely investigating an employee—regardless of the outcome of that investigation—likely can support a claim for Title VII retaliation."). *But see Lee v. Hawaii*, Civ. No. 09-00032, 2010 WL 235009, at *7 (D. Haw. Jan. 20, 2010), *aff'd*, 454 F. App'x 610 (9th Cir. 2011) ("Merely being

Rather, the DOE challenges only the third prong of the prima facie case: it argues that Oman cannot establish causation, for her coworkers' complaints were solely about Oman's conduct, not about the filing of her complaint. ECF No. 71-5, at PageID.317-18. According to the DOE, Oman's coworkers had a sufficient basis for complaining about Oman's conduct. And once they filed complaints, the DOE was obligated to investigate them.

The Court disagrees. As Oman points out, a causal link can be inferred from temporal proximity. *See Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011). Here, the investigations were opened "on the heels of [Oman's] complaints"—a few months after her first one, and just days after the second. *Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000). Moreover, the DOE attaches an excerpt of one of the investigative reports into Oman's conduct. ECF No. 71-9. That excerpt makes clear that Oman's "complaints filed against certain staff members" were part of the conduct on which the investigation focused. *Id.* at PageID.334. A reasonable juror could therefore conclude that the complaints against Oman—and the subsequent investigations—were at least in part motivated by Oman's own complaints.

---

subject to an investigation while others are not does not rise to the level of an adverse employment action for purposes of Title VII.").

The DOE argues that the investigations into Oman were initiated so soon after Oman's complaint was filed—just two days, it says—that there was no time for DOE employees to hatch and execute a retaliatory plan. The investigations, according to the DOE, can therefore not be retaliation.

Even accepting the DOE's narrative as true, what to make of the timing is a question for the factfinder. A period of two days between the protected activity and the adverse employment action may be sufficiently long for a reasonable trier of fact to find a causal relationship between the two. *See, e.g.*, *Dawson*, 630 F.3d at 937.

In any event, those are not the facts here. As the DOE acknowledges, Oman filed her first complaint of sexual harassment in October 2019. ECF No. 71, at PageID.280 (Def.'s CSF ¶ 4). The DOE does not dispute, at least for summary judgment purposes, that it took *no action* with respect to that first complaint. It was not until Oman's second complaint—filed three months later, in January 2020—that investigations were initiated into Oman's complaints *and* the complaints against her. Employees at Iao Intermediate, then, had sufficient time to plan to retaliate against Oman. Indeed, at the hearing, the DOE acknowledged that a gap of three-to-four months between the filing of a complaint and the opening of an investigation would normally be grounds to submit the question to the jury, as the temporal proximity would give rise to a dispute as to whether the complaint

was the but-for cause of an investigation.  That is enough for Oman to satisfy her

"minimal" burden of establishing a prima facie case.  *Emeldi*, 673 F.3d at 1223.

Under the next step in the burden-shifting framework, the DOE must

articulate a legitimate, non-discriminatory reason for opening the investigations.  It

has done so.  The DOE claims that it is "obligated to investigate complaints of

harassment."  ECF No. 71-5, at PageID.319; *see also* ECF No. 71-2, at PageID.287

(Dimino Decl. ¶ 5) ("I had no discretion whether to conduct the investigations or

not.").  And that, the DOE says, is precisely what happened here.

The final burden thus falls on Oman, who must show that there is a genuine

dispute as to whether the DOE's stated rationale was pretextual.  "[B]y itself,"

temporal proximity can "constitute sufficient circumstantial evidence of retaliation

for purposes of both the prima facie case and the showing of pretext."  *Dawson*,

630 F.3d at 937.  In addition to the timing, Oman stresses that the DOE does *not*

automatically investigate complaints of harassment.  As evidence, Oman explains

that when she filed her first complaint in October 2019, the DOE failed to take any

action for several months.  It was not until Oman's second complaint that anyone

at the DOE bothered to investigate, and only after Dillon himself passed along an

email from Oman to the DOE's investigation team.

In light of these circumstances, a reasonable trier of fact could conclude that

the DOE's proffered rationale is "unworthy of credence because it is internally

inconsistent or otherwise not believable." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1127 (9th Cir. 2000) (internal quotation marks omitted). Construed in Oman's favor, the record supports the inference that the DOE, driven by retaliatory aims, opened investigations into Oman. That is sufficient to survive this motion, and the Court therefore DENIES the DOE's motion for summary judgment as to the retaliation claims.

## CONCLUSION

For the foregoing reasons, the DOE's motion for summary judgment is DENIED. Moreover, in accordance with the Court's direction at the hearing, Oman's Motion for Leave to Supplement the Record is GRANTED.

IT IS SO ORDERED.

DATED: June 21, 2024, at Honolulu, Hawai'i.



/s/ Micah W.J. Smith
_____
Micah W.J. Smith
United States District Judge

Civil No. 21-cv-00462 MWJS-WRP; *Tina E. Oman v. State of Hawai'i Department of Education*;
ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

29